# In the United States District Court
# for the Southern District of Georgia
# Savannah Division

TONYA BARRETT,

     Plaintiff,

     v.

REEVES CONSTRUCTION COMPANY,

     Defendant.

4:24-CV-237

## ORDER

Before the Court is Defendant Reeves Construction Company's partial motion to dismiss. Dkt. No. 8. The motion has been fully briefed and is ripe for review. Dkt. Nos. 8, 12, 18. The Court heard oral argument on April 16, 2025. Dkt. No 19. For the reasons set forth below, Defendant's motion is **GRANTED in part and DENIED in part.**

## BACKGROUND[1]

### I.  Factual Background

Plaintiff Tonya Barrett is a forty-five-year-old woman who worked as a Contract Administrator in the Accounting Department at Defendant Reeves Construction Company. Dkt. No. 1 ¶¶ 10, 12.

---

[1] At this stage, the Court must "accept all factual allegations in a complaint as true[,] and take them in the light most favorable to [the] plaintiff[.]" Dusek v. JPMorgan Chase & Co., 832 F.3d 1243, 1246 (11th Cir. 2016).

Plaintiff has a B.B.A. in Finance from Morehead State University and, at the relevant time, had approximately eight to ten years of experience in accounting and four years of experience in the construction field. Id. ¶¶ 31-32. Defendant hired Plaintiff on July 1, 2022 to work at its Garden City, Georgia, Facility. Id. ¶ 34. Her job responsibilities were a "hybrid between those of a Senior Staff Accountant and [an] Assistant Controller." Id. ¶ 35.

According to Plaintiff, the work environment at the Garden City Facility was full of harassment and discrimination. Id. ¶ 39. Vulgar language was "part of the day-to-day vocabulary of several employees," and offensive comments and treatment pertaining to sex and race were common. Id. ¶¶ 40-41. Plaintiff provides many examples of the "offensive and demeaning comments and treatment" that female employees faced, but none involve her specifically. Id. ¶¶ 39-65.

**A. The Alleged Assault**

"Sometime before August 2023," Defendant hired Derrick Stevens, a registered sex offender who was convicted of rape in 1998. Id. ¶¶ 66-67. Stevens has been listed on the sex offender registry since at least 2013. Id. ¶ 69. Prior to hiring Stevens, Defendant performed a background check on him and knew that he was a registered sex offender. Id. ¶¶ 70-71. Stevens was hired as a laborer; his job included working in and around the Garden City Facility and various offsite locations. Id. ¶ 72. The complaint

alleges that Stevens exhibited threatening, violative, and offensive sexual harassment of Defendant's female employees, including Plaintiff. Id. ¶ 73. According to Plaintiff, Defendant knew about this but did not take any action to address it. Id. ¶ 74.

At some point before August 2023, Stevens was assigned to perform "light duty" work inside the office space. Id. ¶ 77. Shortly after receiving this assignment, Stevens started going by Plaintiff's office to ask her questions every day, such as how to login to his computer or phone. Id. ¶¶ 78-79. Stevens did so even though Plaintiff had no supervisory authority over him, Plaintiff did not work in IT, and Stevens had to pass the offices of multiple supervisors who would have been better suited to address his questions. Id. ¶¶ 80-81. Plaintiff alleges that she reported to her supervisors that these visits made her uncomfortable, but Defendant took no action to address it. Id. ¶ 83. One morning, Stevens entered Plaintiff's office to ask for computer help. Id. ¶ 85. While there, he "positioned himself adjacent to Plaintiff and stood over her" while she assisted him with logging in to his computer. Id. ¶ 86. This made Plaintiff feel "vulnerable and threatened" because Stevens was very large—standing at 6'5" tall and almost 400 pounds—and Plaintiff was recovering from a double mastectomy so she could not push, lift, move quickly or defend herself. Id. ¶¶ 87, 89. Then, Stevens kissed Plaintiff. Id. ¶ 90.

Plaintiff was "terrified and disgusted." Id. ¶ 91. She tried to "create distance" between them and said "Okay, now that's enough! Go on now!" Id. ¶ 92.

Plaintiff then informed the Safety Manager, Leonard Turner, of the incident. Id. ¶ 93. Turner found the situation "amusing" and told Plaintiff "better wash that damn forehead because that stink isn't going to come off." Id. ¶ 94. Turner also told Plaintiff to be careful because Stevens "is a convicted criminal for rape and kidnapping" who had not long been out of prison and Plaintiff should "watch[] her back when she leaves her office." Id. ¶¶ 95-96. Turner took no other actions to protect Plaintiff. Id. ¶ 97. Plaintiff then reported the assault to Overbey, the Human Resources Business Partner. Id. ¶ 98. Overbey told Plaintiff to "take matters into her own hands," and that Plaintiff should tell Stevens he cannot enter her office. Id. ¶ 99. Even after Plaintiff's reports, Stevens still came by and "linger[ed]" around Plaintiff's office. Id. ¶ 101.

### B. Plaintiff's Health

In February 2022, Plaintiff underwent genetic testing to determine whether she had a heightened risk of developing breast cancer. Id. ¶ 110. The next month, she learned that she did have a heightened risk. Id. ¶ 111. By late 2022, Plaintiff was experiencing symptoms consistent with breast cancer. Id. ¶ 113. Plaintiff shared this information—her family history of breast

cancer, genetic predisposition for breast cancer, and ongoing symptoms—with Overbey, and Plaintiff's direct supervisors, Brookins and Hall.[2] Id.

In February 2023, Plaintiff's surgeon recommended that she undergo a double mastectomy. Id. ¶ 118. The surgery was performed in June 2023, and Defendant was aware of this. Id. ¶¶ 119–20. After the surgery, Plaintiff was out of work for about four weeks. Id. ¶ 124. During that time, Plaintiff utilized short-term disability benefits. Id. ¶ 122. She returned on July 26, 2023 with physical impairments that impacted her breathing, walking, and ability to lift or push. Id. ¶ 124. However, Plaintiff was still able to perform her job responsibilities. Id. ¶ 127.

After returning to work, Plaintiff began attending doctor appointments related to breast reconstruction surgery, "which often meant she needed approval from her supervisors to miss work." Id. ¶ 128. In October 2023, Plaintiff applied for and was granted continuous FMLA leave for her reconstruction surgery and subsequent recovery. Id. ¶ 131. She was out of work on short term disability and FMLA leave from October 17, 2023 through October 27, 2023 for her first surgery and then November 20, 2023[3] through

---

[2] Clay Brookins was employed as the Controller, and Judy Hall was employed as an Assistant Controller. Dkt. No. 1 ¶¶ 24–25.
[3] Plaintiff's complaint contains what appears to be a typographical error and lists the start date of Plaintiff's leave as November 20, 2024. Id. ¶ 141.

January 29, 2024 for another surgery. Id. ¶¶ 132, 141. She returned to work on January 30, 2024 with some limitations of "major life activities" but was able to perform her job functions. Id. ¶ 165.

**C. Plaintiff's Job Application**

In February 2023, Defendant advertised an open Assistant Controller position. Id. ¶ 114. The desired candidate was someone with a degree in finance, accounting, or business administration and three to five years of accounting experience, most preferably in the construction field. Id. ¶ 116. Plaintiff satisfied these criteria. Id. ¶ 117. By early January 2024, the Assistant Controller position was still not filled despite Defendant having given job offers to "at least four underqualified men in their early- to mi[d]-twenties." Id. ¶¶ 144-45. On January 8, 2024, Plaintiff sent her resume to Overbey, who had previously told Plaintiff that she was qualified, and Plaintiff said that she wanted to apply for the Assistant Controller position. Id. ¶¶ 146-47.

Plaintiff interviewed for the position on January 9, 2024 with a Talent Acquisition Specialist, Crystal Wierzba, who was assisting Defendant with sourcing candidates. Id. ¶ 151. Wierzba told Plaintiff that she would submit Plaintiff's application and materials, but Plaintiff needed to inform Brookins that she was applying to the position. Id. ¶ 154. Plaintiff did so. Id. ¶ 159. During the interview, Wierzba asked Plaintiff if she would relocate

for the job. Id. ¶ 155. Plaintiff said yes, and Wierzba followed up by asking, "Maybe you are willing to relocate today, but would you be tomorrow?" Id. ¶ 156. Plaintiff asserts that she believed "Wierzba was discouraging her from continuing to pursue the Assistant Controller position and that Plaintiff's sex, disability, genetic information, and/or age motivated Wierzba's comment." Id. ¶ 158.

On January 23, 2024, Plaintiff contacted Wierzba to ask for an update on her application. Id. ¶ 160. Plaintiff was told that Wierzba had not submitted Plaintiff's application yet because she wanted "at least a few candidates" before submitting applications to Brookins. Id. ¶ 161. Though Brookins refused to review Plaintiff's application until he had had other candidates, he conducted an interview with other individuals, including at least one young male candidate. Id. ¶ 162. That same day, Carolyn DeVore, one of Plaintiff's colleagues who used to work in Human Resources, told Plaintiff that she thought Plaintiff was being discriminated against because there was no policy that required multiple candidates before Brookins could consider Plaintiff's application. Id. ¶ 163.

On February 1, 2024, Plaintiff asked Overbey about her application status, and Plaintiff stated that she believed she was being treated unfairly by having to wait until there were other candidates for her application to be reviewed. Id. ¶¶ 168-69.

Plaintiff further stated that Brookins was being "chauvinistic" because Defendant had offered the job to men who lacked the experience stated in the job posting. Id. ¶ 172. Overbey shared this complaint with Brookins, Hall, and Newman. Id. ¶ 174. On February 2, 2024, Plaintiff stopped by Brookins's office to ask if he had time to discuss her application. Id. ¶ 182. He responded that he was busy and instructed Plaintiff to return in a week. Id. ¶ 183. On February 5, 2024, Plaintiff asked Brookins about the status of her application again, and Brookins told her that he was busy. Id. ¶¶ 184-85. On February 12, 2024, Plaintiff emailed Brookins to ask about her application status; Brookins visited Plaintiff's office and said that Defendant would not consider her for the job "because she did not have the required seven years of experience." Id. ¶ 187. However, the job posting did not include a "required" amount of experience and sought a candidate with only three to five years of experience. Id. ¶ 188.

Plaintiff alleges Defendant did not consider her for the Assistant Controller job because of her "uniquely female health concerns," i.e., the risk of ultimately developing breast cancer despite the steps she took to "stave off cancer," and Plaintiff believes she was being punished for reporting to Human Resources that Defendant discriminated against her for using FMLA leave entitlements. Id. ¶ 192. As a result, on February 14, 2024, Plaintiff submitted her resignation letter to Brookins, Hall, and

Overbey. Id. ¶ 193. In Plaintiff's exit interview on February 23, 2024, Plaintiff again reported that she was resigning because Defendant discriminated against her by refusing to consider her for the Assistant Controller job and that she was treated in a "chauvinistic manner." Id. ¶ 197.

On March 27, 2024, Defendant hired a young female applicant to fill the Assistant Controller position. Id. ¶ 204. Unlike Plaintiff, this woman did not have three to five years of experience in accounting, had no experience in the construction field, was not required to relocate, did not have genetic testing results indicating she had a heightened risk of breast cancer, was not disabled or perceived as disabled, had not previously spoken out about discrimination by Defendant, and had not exercised her FMLA rights with Defendant. Id. ¶¶ 205–09.

**D. Plaintiff's 2023 Bonus**

Around November 2023, Overbey told Plaintiff that the 2023 annual bonuses were approved and that "everyone would be happy." Id. ¶ 140. In February 2024, Plaintiff inquired with Defendant's Payroll Manager about the bonuses. Id. ¶ 179. Two individuals in the payroll department, including the Payroll Manager, told Plaintiff that bonuses had been approved and would be effective on March 1, 2024. Id. ¶¶ 180–81.

On March 4, 2024, Plaintiff's separation from Defendant became effective. Id. ¶ 198. On March 15, 2024, Plaintiff contacted

Human Resources to inquire about the status of her bonus. Id. ¶ 199. Overbey told Plaintiff that her 2023 bonus "was not approved until later after [she] left so [she] w[as] not eligible." Id. ¶ 200. As a result, Defendant refused to pay Plaintiff's bonus. Id. ¶ 201. Plaintiff alleges that Defendant discriminated against her based on her "uniquely female health concerns" and her being unable to work after her mastectomy and reconstruction surgeries. Id. ¶ 203. Plaintiff further alleges that Defendant was punishing her for her "good faith opposition to Defendant's discriminatory conduct by refusing to pay Plaintiff's 2023 bonus" and for using her FMLA benefits. Id.

## II. Procedural Background

On May 13, 2024, Plaintiff submitted an intake questionnaire with the EEOC. Dkt. No. 12-1 at 4. In her questionnaire, Plaintiff explained that she had applied for a promotion in January 2024 while she was out on short term disability leave. Id. Plaintiff stated that after she applied, the position was offered to three different men who did not meet the stated requirements. Id. Further, Plaintiff reported that after she returned to work at the end of January and asked for updates on the hiring process, she was repeatedly ignored by the recruiter and hiring manager. Id. In February 2024, her manager told her that she did not have the "required" seven years of experience for the job.

On July 1, 2024, Plaintiff submitted her charge. Dkt. No. 1-1 at 2. In her charge, Plaintiff marked that the reasons for her discrimination were age, disability, and genetic information. Id. Plaintiff did not check the boxes for sex or retaliation. Id. Plaintiff's notice of her right to sue was issued on July 25, 2024, and stated that she must file suit within ninety days. Dkt. No. 1-2 at 2.

Plaintiff filed suit against Defendant on October 16, 2024, asserting federal claims for discrimination in violation of the Americans with Disabilities Act ("ADA") (Count One), the Genetic Information Nondiscrimination Act ("GINA") (Count Two), the Age Discrimination in Employment Act ("ADEA") (Count Three), and Title VII (Count Four). Dkt. No. 1. Plaintiff also alleges that Defendant retaliated against her in violation of Title VII (Count Five) and the Family Medical Leave Act ("FMLA") (Count Six). Id. Further, Plaintiff sets forth state-law claims for negligent hiring, retention, and supervision (Count Seven), negligent failure to prevent sexual harassment (Count Eight), and intentional infliction of emotional distress (Count Nine). Id.

Defendant moved to dismiss Plaintiff's complaint on November 26, 2024. Dkt. Nos. 8, 8-1. Plaintiff responded, dkt. no. 12, and Defendant replied, dkt. no. 18. A hearing was held on April 16, 2025, and both parties were present. Dkt. No. 19.

**LEGAL AUTHORITY**

Federal Rule of Civil Procedure 8(a)(2) requires that a complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief." While this pleading standard does not require "detailed factual allegations," "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). To withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. (quoting Twombly, 550 U.S. at 570). A complaint is plausible on its face when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

In deciding whether a complaint states a claim for relief, the Court must accept the facts alleged in the complaint as true and draw all reasonable inferences in favor of the plaintiff. Ray v. Spirit Airlines, Inc., 836 F.3d 1340, 1347 (11th Cir. 2016). The Court should not accept allegations as true if they merely recite the elements of the claim and declare that they are met; legal conclusions are not entitled to a presumption of truth. Iqbal, 556 U.S. at 678-79.

12

A complaint must "contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." Fin. Sec. Assurance, Inc. v. Stephens, Inc., 500 F.3d 1276, 1282-83 (11th Cir. 2007) (per curiam) (quoting Roe v. Aware Woman Ctr. for Choice, Inc., 253 F.3d 678, 683 (11th Cir. 2001)). Ultimately, if "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]'—'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

While the factual allegations set forth in the complaint are to be considered true at the motion to dismiss stage, the same does not apply to legal conclusions set forth in the complaint. Sinaltrainal v. Coca-Cola Co., 578 F.3d 1252, 1260 (11th Cir. 2009) (citing Iqbal, 556 U.S. at 678). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678. The Court need not "accept as true a legal conclusion couched as a factual allegation." Twombly, 550 U.S. at 555 (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)). Furthermore, the Court "is not required to credit conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts." Warren Tech., Inc. v. UL LLC, 962 F.3d 1324, 1328 (11th Cir. 2020) (citation and quotations omitted).

**DISCUSSION**

**I.   Administrative Remedies**

Defendant argues that Plaintiff's claims pursuant to Title VII are subject to dismissal because (1) Plaintiff's Title VII sexual discrimination and retaliation claims are not within the scope of her EEOC charge[4] and (2) Plaintiff's claims are time-barred. Dkt. 8-1 at 2.

**A. Title VII Claims**

A condition precedent to filing a Title VII action is exhaustion of administrative remedies. Scott v. City of Brunswick, No. CV 211-119, 2012 WL 2562422, at *4 (S.D. Ga. June 29, 2012). "[O]nce a defendant asserts that a plaintiff has failed to satisfy the preconditions to a Title VII action, it is the plaintiff's burden to prove that those preconditions have been satisfied." Id. (citations omitted).

Defendant moves to dismiss Plaintiff's Title VII claims—sex discrimination and retaliation—on the basis that they are outside the scope of the EEOC Charge, because Plaintiff checked the boxes for only age, disability, and genetic information discrimination. Dkt. No. 8. Plaintiff argues that she did exhaust her Title VII

---

[4] Although Plaintiff's intake questionnaire is not attached to her complaint, both parties refer to it, and both parties agree that the Court need not convert this motion to dismiss into a motion for summary judgment. Dkt. No. 19; see also SFM Holdings, Ltd. v. Banc of Am. Sec., LLC, 600 F.3d. 1334, 1337 (11th Cir. 2010).

claims because her EEOC intake questionnaire alleges both sex discrimination and retaliation, and the intake questionnaire can constitute a charge of discrimination. Dkt. No. 12 at 2. Alternatively, Plaintiff argues that even if the questionnaire does not constitute a charge, it can still inform the scope of the EEOC investigation. Id.

The Court need not address whether Plaintiff's questionnaire constitutes a charge in this case. Even assuming that the questionnaire is not a charge, Plaintiff's Title VII sex discrimination and retaliation allegations are within the scope of the EEOC investigation. Eleventh Circuit precedent dictates that "a plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." Gregory v. Ga. Dep't of Hum. Res., 355 F.3d 1277, 1280 (11th Cir. 2004) (citation omitted). The circuit has "noted that judicial claims are allowed if they amplify, clarify, or more clearly focus the allegations in the EEOC complaint, but has cautioned that allegations of new acts of discrimination are inappropriate." Id. at 1279-80. (quotation and citation omitted). Courts are "extremely reluctant to allow procedural technicalities to bar claims brought under Title VII." Id. at 1280 (quotation and citation omitted). Accordingly, the "proper inquiry" for the Court "is whether the plaintiff's complaint is like or related to, or grew out of, the allegations

contained in the EEOC charge." Batson v. Salvation Army, 897 F.3d 1320, 1328 (11th Cir. 2018) (quotation and citation omitted).

Based on the allegations in Plaintiff's complaint and the information included in her EEOC charge, the Court concludes that Plaintiff's Title VII claims are "related to" the conduct that Plaintiff describes in her EEOC charge. In Gregory, the plaintiff filed an EEOC charge for gender and race *discrimination* without marking retaliation. 355 F.3d at 1279. However, in her lawsuit, the plaintiff alleged that her employer terminated her because of her "race and/or in *retaliation* for complaining" of race discrimination. Id. (emphasis added). The Eleventh Circuit affirmed the district court's determination that the "[plaintiff's] retaliation claim was not administratively barred by her failure to mark the retaliation space on the EEOC template form." Id. at 1280. The court explained that "the EEOC presumably investigated, at least in some fashion, the possible reasons why [plaintiff] was terminated, growing from her initial 'belief' that it was because of her race and sex." Id. Thus, according to the facts the plaintiff alleged in her charge, "[a]n EEOC investigation of her race and sex discrimination complaints leading to her termination would have reasonably uncovered any evidence of retaliation," thus, the allegations in her complaint "related to" those in her charge. Id.

So, too, here. Plaintiff's EEOC charge identifies only age, disability, and genetic information as the bases for Defendant's alleged discrimination and states that the allegedly discriminatory acts relate to a promotion for which she applied while on FMLA leave. Dkt. No. 1-1 at 2. Plaintiff also states in the charge that she repeatedly asked for updates on the hiring process and that the recruiter "changed her story several times" about why Plaintiff's application was not being considered. Id. However, Plaintiff's complaint contains allegations that she experienced discrimination based on her *sex*—that is, her "uniquely female health concerns"—and retaliation for engaging in protected activity—that is, her informing both her supervisor and the Human Resources Business Partner that she had been treated in a "chauvinistic manner." Dkt. No. 1 ¶¶ 172, 192, 197, 203, 238-55.

Based on the statements in Plaintiff's charge, "a reasonable EEOC investigator" would inquire, at least to some extent, into "the possible reasons why [Plaintiff was denied the promotion], growing from her initial 'belief' that it was because of her [age, disability, and genetic information.]" Gregory, 355 F.3d at 1280. Minimal investigation into Plaintiff's assertions of disability or genetic-based discrimination would reveal that Plaintiff had a double mastectomy, a procedure most commonly performed on women, and could give rise to questions about whether Plaintiff's sex had

17

anything to do with Defendant's decision to not promote her.[5]
Furthermore, with regard to her retaliation claim, Plaintiff
identified in her charge that the HR recruiter gave Plaintiff
several different reasons for not considering her application.
Dkt. No. 1-1 at 2. Thus, some level of examination by "a reasonable
EEOC investigator" into what those varying reasons would reveal
that Plaintiff had previously reported to HR that she was being
treated chauvinistically.

**B. Time-Barred Claims**

Prior to filing suit for claims alleging violations of the
ADA, ADEA, GINA, or Title VII, "a plaintiff first must file a
charge of discrimination with the EEOC." Gregory, 355 F.3d at 1279
(Title VII); Maynard v. Pneumatic Prods. Corp., 256 F.3d 1259,
1262 (11th Cir. 2001) (per curiam) (ADA); Dobbs v. Martin Marietta
Materials, Inc., No. 21-13533, 2022 WL 4232792, at *1 (11th Cir.
Sept. 14, 2022) (ADEA); Howard v. Olenick & Assoc., Inc., No. 21-

---

[5] In Penaloza v. Target Corp., the Eleventh Circuit concluded that
the plaintiff's suit containing a disability discrimination claim
could not "be expected to grow out of" her sex and pregnancy
discrimination allegations identified in her EEOC charge. 549 F.
App'x 844, 848 (11th Cir. 2013). Penaloza is distinguishable from
this case. In Penaloza, the basis for plaintiff's disability claim,
i.e., her high-risk pregnancy, "arose after her departure from
[her employment with the defendant]." Id. at n.2. Here, the basis
for Plaintiff's disability and genetic discrimination claims in
her EEOC charge, her double mastectomy, occurred while she was
employed by Defendant and therefore properly informs the scope of
the EEOC investigation and what claims may "gr[o]w out" of her
charge. Batson, 897 F.3d at 1328 (quotation and citation omitted).

cv-4748, 2022 WL 22329221, at *2 (N.D. Ga. Feb. 7, 2022) (GINA),
report and recommendation adopted by 2022 WL 22329175 (Feb. 28,
2022). This exhaustion requirement seeks to ensure that the EEOC
has "the first opportunity to investigate the alleged
discriminatory practices to permit it to perform its role in
obtaining voluntary compliance and promoting conciliation
efforts." Gregory, 355 F.3d at 1279 (citation and quotation
omitted). Georgia is a "non-deferral state," so a "plaintiff must
file a charge of discrimination with the EEOC within 180 days after
the date of the alleged discriminatory act." Coley v. Shaw Indus.,
Inc., No. 21-10545, 2021 WL 4429818, at *1 n.1 (11th Cir. Sept.
21, 2021) (citing 29 C.F.R. § 1626.7(a); Wilkerson v. Grinnell
Corp., 270 F.3d 1314, 1317 (11th Cir. 2001)).[6]

Plaintiff filed her charge of discrimination on July 1, 2024.
Dkt. No. 1-1 at 2. Defendant contends that some of Plaintiff's
claims are barred because they are based on acts that occurred
before January 12, 2024 (180 days before the charge was filed).
Dkt. No. 8-1 at 7. Importantly, Defendant concedes that Plaintiff's
claims of discrimination and retaliation based on (1) Plaintiff
being denied the Assistant Controller promotion, (2) Plaintiff not

---

[6] "Whether a state is a 'deferral' or 'non-deferral' state depends
on whether it has laws banning the kind of discrimination alleged
and whether it has state entities authorized to grant or seek
relief for victims of such discrimination." Coley, 2021 WL 4429818,
at *1 n.1 (citing Hipp v. Liberty Nat'l Life Ins. Co., 252 F.3d
1208, 1214 n.2 (11th Cir. 2001)).

receiving her 2023 bonus, and (3) Plaintiff's use of FMLA leave *are* timely.[7] Dkt. No. 19. Defendant *does* take issue with Plaintiff's allegations of "sex-based" comments in the workplace and Plaintiff's alleged assault by Stevens, arguing that any claims based on these events are time-barred because they occurred more than 180 days before EEOC charge was filed. Dkt. No. 8-1 at 10–11. To be sure, if Plaintiff intended to root her Title VII claims for sex-based discrimination and retaliation on these discrete acts alone, then they **DISMISSED** as time-barred.[8] See, e.g., Beavers v. Am. Cast Iron Pipe Co., 975 F.2d 792, 796 (11th Cir. 1992) (stating that discrete discriminatory acts occurring more than 180 days before the filing of a charge of discrimination are not timely). However, because Plaintiff's Title VII claims "gr[o]w out of" her ADA, ADEA, and GINA claims, which in turn are based on timely adverse events—the promotion denial, the bonus denial, and Plaintiff's use of FMLA leave—Plaintiff's Title VII claims are timely as well. Batson, 897 F.3d at 1327-28 (quoting Gregory, 355

---

[7] Initially, Defendant contested this point and argued that the pertinent time for Plaintiff's failure-to-promote claim was February 2023 when the job was initially posted. Dkt. No. 8-1 at 11. However, at oral argument, Defendant conceded that these claims were timely. Dkt. No. 19.

[8] While Plaintiff concedes that some of the discrete acts alleged in the complaint may fall outside of the 180-day window for Plaintiff's EEOC action, she contends that the conduct is still relevant to her damages claims and other affirmative claims, such as emotional distress. Dkt. No. 19.

F.3d at 1280). Therefore, Plaintiff's Title VII claims of sex discrimination and retaliation are not time-barred.

## II.  **Plaintiff's State Law Claims**

### A. Georgia Workers' Compensation Act Does Not Bar State Law Claims

Defendant argues that Plaintiff's state law tort claims must be dismissed because they are barred by the exclusivity provision found in the Georgia Workers Compensation Act ("GWCA"). Dkt. No. 8-1 at 2. The GWCA "is intended to have broad application so as to cover a wide variety of injuries and the pain and suffering incident to such injuries." Ray Bell Const. Co. v. King, 642 S.E.2d 841, 854 (Ga. 2007). This Act includes an "exclusive remedy provision, [which] provides that the employee's rights and remedies under the Workers' Compensation Act exclude all other rights of the employee due to injury, loss of service, or death except the right to bring an action against a third-party tort-feasor." Warden v. Hoar Const. Co., 507 S.E.2d 428, 429 (Ga. 1998) (citing O.C.G.A. § 34-9-11). An injury is encompassed by the GWCA "if it arises out of and in the course of the employment." Mayor & Aldermen of Savannah v. Stevens, 598 S.E.2d 456, 457 (Ga. 2004). An injury must satisfy both of these "independent and discrete criteria." Id.

"An injury arises 'in the course of' employment when it occurs within the period of the employment, at a place where the employee

may be in performance of her duties and while she is fulfilling or doing something incidental to those duties."[9] Frett v. State Farm Emp. Workers' Comp., 844 S.E.2d 749, 752 (Ga. 2020) (quotation and citation omitted). This pertains to the "time, place and circumstances under which the injury takes place." Id. (quotation and citation omitted). In this case, Plaintiff's alleged injury, severe emotional distress from "acts of sexual harassment and assault, discrimination, and retaliation against Plaintiff," occurred while she was employed by Defendant and was in her office at work. Dkt. No. 1 ¶ 294; see, e.g., ¶¶ 78-104 (detailing Plaintiff being kissed at work by a co-worker, reporting it to her supervisors, and being told to "watch[] her back"). Accordingly, Plaintiff's injury arose "in the course of" her employment.

Next, "[a]n injury arises 'out of' the employment when a reasonable person, after considering the circumstances of the employment, would perceive a causal connection between the conditions under which the employee must work and the resulting injury." Frett, 844 S.E.2d at 754 (citation and quotation omitted). More specifically, "[t]he causative danger must be incidental to the character of the employment, and not independent of the relation of master and servant." Id. at 754 (citation and quotation

---

[9] "Incidental activities" can include things like "ingress and egress to the place of work while on the employer's premises," eating lunch, using the restroom or attending to other "routine personal needs." Frett, 844 S.E.2d at 752.

omitted). "[A] risk is incident to the employment when it belongs to, or is connected with, what a workman has to do in fulfilling his contract of service." Id.

In Georgia, "harassment or abuse of a sexual nature is generally considered to fall outside the realm of what an employee may expect to arise 'out of' her employment because the harasser is not acting to further the employer's interest in committing the harassing conduct." Pittman v. Ulmer Enter., Inc., No. 1:05-CV-0282, 2006 WL 8432198, at *7 (N.D. Ga. June 23, 2006) (citing Travis Pruitt & Assoc. v. Hooper, 625 S.E.2d 445, 448 (Ga. Ct. App. 2005), report and recommendation adopted by 2006 WL 8432915 (Sept. 7, 2006)). In Pittman, the plaintiff was hired as a waitress at a club. Id. at *6. The court concluded that her allegations of sexual harassment and battery did not arise "out of" her employment because "there [was] no contention that her job required her to flash her breasts at bartenders or otherwise subject herself to sexual harassment and abuse by co-workers," even though defendant argued that "alleged sexual abuse was part of the 'overall environment'" at the club. Id. Similarly, in Murphy v. ARA Services, Inc., the court concluded that the "risk of verbal and physical abuse of a sexual nature alleged" by plaintiff, who worked in a cafeteria, was not "in any way connected" with plaintiff's work responsibilities. 298 S.E.2d 528, 531 (Ga. Ct. App. 1982).

The facts of these cases are similar to those Plaintiff alleges here. Defendant contends that Plaintiff "goes to great lengths to allege that her work conditions" put her at an elevated risk for this conduct. Dkt. No. 18 at 12–13. However, nowhere in Plaintiff's complaint does she allege that her job involved acts that would suggest sexual harassment or abuse might relate to her duties. Plaintiff asserts that she worked in the accounting department of a construction company. Dkt. No. 1 ¶ 34. Although she alleges that "vulgar, profane, and crude language" were commonly used among the workplace, that did not make it *part* of her job such that the Court should infer, at this stage, that the risk of sexual abuse was "connected with" what Plaintiff "ha[d] to do in fulfilling [her] contract of service." <u>Id.</u> In sum, although the alleged harm occurred in the course of Plaintiff's job, it did not arise out of her employment. As such, Plaintiff's claims are not barred by the GWCA.[10]

---

[10] The parties dispute whether Plaintiff suffered a physical harm such that her claims are barred by the exclusivity provision of the GWCA. Dkt. Nos. 8-1 at 13, 12 at 17. <u>See</u> <u>Woods v. Ga. Pac. Corp.</u>, No. CV206-190, 2007 WL 403582, at *3 (S.D. Ga. Feb. 1, 2007) (concluding that the GWCA did not bar IIED claim when the only injury in the case was non-physical); <u>Miraliakbari v. Pennicooke</u>, 561 S.E.2d 483, 485–86 (Ga. Ct. App. 2002) ("The Workers' Compensation Act provides no remedy for a psychological injury unless it arises naturally and unavoidably from some discernible physical occurrence." (internal quotations and citations omitted) (alterations adopted)); <u>Lewis v. Northside Hosp., Inc.</u>, 599 S.E.2d 267, 269 (Ga. Ct. App. 2004) ("[W]here an employee suffers a physical injury in the course of employment . . . a related claim for mental damages will be barred by the Act's exclusive remedy

**B. Plaintiff States a Claim for Which Relief Can be Granted**

Defendant argues in the alternative that even if Plaintiff's state law tort claims are not prohibited by the GWCA, they still must be dismissed because Plaintiff fails to state a claim for which relief can be granted. Dkt. No. 8-1 at 3.

**i.    Intentional Infliction of Emotional Distress**

Defendant argues that Plaintiff did not adequately plead a claim for intentional infliction of emotional distress because Defendant's conduct was not extreme and outrageous. Dkt. No. 8-1 at 16–19. Four elements must be present to maintain a claim for intentional infliction of emotional distress ("IIED"): "(1) The conduct must be intentional or reckless; (2) The conduct must be extreme and outrageous; (3) There must be a causal connection between the wrongful conduct and the emotional distress; and (4) The emotional distress must be severe." Cottrell v. Smith, 788 S.E.2d 772, 780 (Ga. 2016). Conduct is considered "extreme and outrageous" when it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized

---

provision."). Defendant argues that Plaintiff's IIED claim rests on an underlying physical injury—the assault—so any associated mental damages are barred by the GWCA. Dkt. No. 8-1 at 13. Assuming *arguendo* that the alleged assault was a physical harm, Defendant's argument still fails. Defendant presumes that the GWCA applies to the underlying physical harm. However, as established supra, Plaintiff's harm did not "arise out of" her employment and is not within the ambit of the GWCA.

community." Id. (citation omitted). Importantly, it is not enough "that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by malice, or a degree of aggravation that would entitle the plaintiff to punitive damages for another tort." Id.

Defendant argues that Plaintiff does not allege facts showing Defendant's conduct was extreme and outrageous. Dkt. No. 8-1 at 16–19. To assess this issue, the Court asks whether "the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and leave him to exclaim 'Outrageous!'" Yarbray v. S. Bell Tel. & Tel. Co., 409 S.E.2d 835, 837 (Ga. 1991) (citing Restatement (Second) of Torts § 46(1), cmt. d).

Defendant correctly argues that Plaintiff cannot maintain a claim for IIED because she was denied a promotion and her bonus.[11] Dkt. No. 8-1 at 18; see also Roddy v. City of Villa Rica, Ga., 536 F. App'x 995, 1003 (11th Cir. 2013) ("Georgia courts have held that an employer's termination of an employee—however stressful to the employee—generally is not extreme and outrageous conduct."); Woodward v. Jim Hudson Luxury Cars, Inc., No. CV-118-032, 2019 WL 4793058, at *14 (S.D. Ga. Sept. 30, 2019) ("Absent abuse or

---

[11] To the extent Plaintiff bases her IIED claim on the denial of a promotion and/or bonus, that claim is **DISMISSED**.

disrespect, an employment action is not extreme or outrageous conduct as a matter of law.").

Plaintiff's IIED claim is not based solely on the denial of a promotion and bonus, however. Plaintiff also alleges she was sexually harassed and subjected to abusive treatment after she reported the incident. Dkt. No. 12 at 21. Plaintiff alleges that another employee, Stevens, a registered sex offender, was assigned to work "in and around the Garden City facility and offsite locations" without any safeguards in place. Dkt. No. 1 ¶¶ 67, 69, 72, 77. Plaintiff asserts that she became uncomfortable when Stevens began to repeatedly visit her office to ask questions and, when she informed her supervisors of this, they took no action to stop it or protect her. Id. ¶¶ 79, 82–83. Further, Plaintiff claims that Stevens entered her office one day and kissed her, making Plaintiff feel "terrified and disgusted." Id. ¶¶ 90–91. Plaintiff alleges that she was fearful when Stevens entered her office and felt "especially vulnerable and threatened" because she was recovering from surgery. Id. ¶ 89. Moreover, Plaintiff alleges that when she informed her safety manager about the incident, he found it amusing and told her that she "better wash that damn forehead because that stink isn't going to come off." Id. ¶¶ 93–94. The Safety Manager also "warned Plaintiff to be careful" because Stevens was "a convicted criminal for rape and kidnapping," so Plaintiff should "watch[] her back" when leaving her office.

27

Id. ¶¶ 95-96. Plaintiff also reported the incident to a Human Resources supervisor who told her to "take matters into her own hands" and tell Stevens not to come into her office. Id. ¶¶ 99-100.

While Defendant argues that there are IIED cases with more egregious facts that did not reach a jury, dkt. no. 8-1 at 18, "at this early stage in the proceedings," the Court cannot conclude that Plaintiff "would not be entitled to relief under any state of provable facts with regard to the outrageous aspect of [her] claim." Mayorga v. Benton, 875 S.E.2d 908, 914 (Ga. Ct. App. 2022). Indeed, many of the cases on which Defendant relies are factually distinguishable or were decided on summary judgment, not a motion to dismiss. See, e.g., Boothe v. Henderson, 31 F. Supp. 2d 988 (S.D. Ga. 1998) (finding that plaintiff could not satisfy the outrageous and egregious prong on a motion for summary judgment); Smith v. Akstein, 408 F. Supp. 2d 1309, 1335–36 (N.D. Ga. 2005) (granting defendant's motion for summary judgment on plaintiff's IIED claim because the "unwanted attention, comments, and contact" from defendant, a doctor, did not rise to the level of outrageousness and egregiousness necessary under Georgia law); Spears v. Kaiser Found. Health Plan of Ga., Inc., No. 1:17-CV-02102, 2019 WL 1225214, at *32-33 (N.D. Ga. Jan. 30, 2019) (concluding plaintiff's IIED claim arising out of harassment and termination of her employment could not survive summary judgment),

report and recommendation adopted by 2019 WL 1225199 (Feb. 14, 2019); see also dkt. no. 18 at 17 (distinguishing the cases relied on by Plaintiff and identifying that, in at least one, the plaintiff's IIED claim survived motion to dismiss but was thrown out at summary judgment (citing Fortson v. Columbia Farms Feed Mill, No. 3:13-CV-51, 2013 WL 5348097 (M.D. Ga. Sept. 23, 2013)).

Accordingly, at this stage, accepting Plaintiff's alleged facts as true, the Court cannot conclude, as a matter of law, that Defendant's conduct was not extreme and outrageous. See Mayorga, 875 S.E.2d at 915 ("This Court should not decide the propriety of this particular motion to dismiss based upon cases in which the parties have had an opportunity to fully develop the facts demonstrating the outrageous nature of the conduct at issue . . . ."); Ward ex rel. J.E. v. McIntosh Cnty. Sch. Dist., No. CV 218-013, 2018 WL 5087234, at *3 (S.D. Ga. Oct. 18, 2018) ("Defendant's reliance on cases in which summary judgment was granted because no medical treatment was rendered are inapposite . . . . Here, we are at the motion to dismiss phase."). Defendant's motion to dismiss Plaintiff's IIED claim is therefore **DENIED**.

### ii. Ratification

Defendant argues that Plaintiff's ratification count should be dismissed because ratification is not an independent cause of action. Dkt. No. 8-1 at 19. Further, Defendant claims that it

29

cannot ratify conduct of its employees that was done for purely personal reasons. Id.

"Ratification can be either express, or implied from: (1) slight acts of confirmation by the employer; (2) silence or acquiescence of the employer; *or* (3) where the employer receives and holds the benefits of an unauthorized wrong." Whitaker Farms, LLC v. Fitzgerald Fruit Farms, LLC, 819 S.E.2d 666, 671 (Ga. Ct. App. 2018) (emphasis in original).

Defendant is correct that ratification is a theory of liability and therefore must be asserted in conjunction with a substantive claim. See, e.g., Whitaker Farms, LLC, 819 S.E.2d at 671 (collecting cases); Brady v. Harris Ventures Inc., No. 21-cv-01649, 2022 WL 22288532, at *16 (N.D. Ga. Jan. 10, 2022) (discussing ratification theory under Georgia law), report and recommendation adopted by 2022 WL 22288351 (Feb. 3, 2022); Travis Pruitt & Assoc., 625 S.E.2d at 449, 454 (explaining ratification of tortious conduct). Accordingly, to the extent Plaintiff relies on Count Nine of her complaint to assert an independent cause of action for ratification, that claim is **DISMISSED**. However, to the

extent Plaintiff relies on ratification as a theory of liability to accompany her surviving IIED claim, she is free to do so.[12] [13]

### iii. Negligence Claims

Plaintiff asserts two negligence claims: (1) negligent retention, hiring, training, and supervision (Count Seven),[14] and

---

[12] At the hearing, Defendant "readily conceded" that Plaintiff is free to assert a theory of ratification for her surviving claims. Dkt. No. 19.

[13] Defendant also argues that Plaintiff's ratification theory cannot save Plaintiff's IIED claim because employers cannot be liable via ratification for "tortious acts of employee[s] done for purely personal reasons entirely disconnected from the employer's business." Dkt. No. 8-1 at 19 (quoting Woods v. Ga. Pac. Corp., No. CV206-190, 2008 WL 1134854, at *12 (S.D. Ga. June 20, 2008)). Thus, according to Defendant, there is an "inherent tension" in Plaintiff's position that actions like Stevens kissing her are "purely personal" such that the GWCA does not apply, but that same conduct is not "purely personal" for purposes of Plaintiff's IIED claim. Dkt. No. 19. Such "tension" may be present, but at the pleading stage, "[l]itigants in federal court may pursue alternative theories of recovery, regardless of their consistency." Brookhaven Landscape & Grading Co., Inc. v. J.F. Barton Contracting Co., 676 F.2d 516, 523 (11th Cir. 1982).

[14] Defendant argued at the hearing that, under Georgia law, Plaintiff's claim for negligent retention, hiring, and training is "one and the same" as Plaintiff's claim for negligent failure to prevent sexual harassment. Dkt. No. 19. To support this position, Defendant directs the Court to Dault v. Georgia Urology, P.A., where the court stated that "[i]t seems clear that a negligent retention claim is the same as a claim for negligent failure to maintain a work environment free from sexual harassment." No. 20-cv-00828, 2020 WL 10139416, at *6 n.4 (N.D. Ga. Dec. 18, 2020) (citations omitted), report and recommendation adopted by 2021 WL 2517373 (Feb. 1, 2021). Even so, at the pleading stage, litigants can pursue alternative theories of recovery, and thus Plaintiff can assert both claims. Brookhaven Landscape & Grading Co., Inc., 676 F.2d at 523.

(2) negligent failure to prevent sexual harassment (Count Eight). Defendant moves to dismiss both.[15]

Defendant first argues that Count Seven must be dismissed because there is no underlying tort to support Plaintiff's negligent retention, training, and supervision claim. Id. at 22. Georgia law provides that

> a defendant employer has a duty to exercise ordinary care not to hire or retain an employee the employer knew or should have known posed a risk of harm to others where it is reasonably foreseeable from the employee's "tendencies" or propensities that the employee could cause the type of harm sustained by the plaintiff.

Tomczyk v. Jocks & Jills Rest., LLC, 198 F. App'x 804, 815 (11th Cir. 2006) (quoting Munroe v. Universal Health Servs., Inc., 596 S.E.2d 604, 606 (Ga. 2004)). A claim for negligent hiring and retention may be asserted if a plaintiff alleges that "the employer, in the exercise of reasonable care, should have known of an employee's reputation for sexual harassment and that it was foreseeable that the employee would engage in sexual harassment of a fellow employee but he was continued in his employment." Coleman v. Housing Auth. of Americus, 381 S.E.2d 303, 307 (Ga. Ct. App. 1989) (citation and quotation omitted); see also Poole v. N. Ga.

---

[15] Defendant's motion to dismiss identifies negligent retention, hiring, and training as Count Eight and "negligence" as Count Seven. Dkt. No. 8 at 1. According to Plaintiff's complaint, Count Seven asserts a claim for negligent training, hiring, and supervision, while Count Eight is a claim for negligent failure to prevent sexual harassment. Dkt. No. 1 at 33–34.

Conf. of the Methodist Church, 615 S.E.2d 604, 607 (Ga. Ct. App. 2005). Critically, a claim for negligent retention and supervision "is necessarily derivative" and only survives "to the extent that the underlying substantive claims survive the same." MARTA v. Mosley, No. 10-cv-153, 634 S.E.2d 466, 469 (Ga. Ct. App. 2006); Couick v. Effingham Cnty. Hosp. Auth., No. 4:10-cv-153, 2011 WL 13284616, at *8 (S.D. Ga. Mar. 21, 2011) (collecting cases).

As concluded supra, the Court rejects Defendant's contention that Plaintiff's IIED claim should be dismissed at this time. Accordingly, Plaintiff maintains an underlying tort claim to support her negligent retention and supervision claim. Thus, Defendant's argument necessarily fails, and its motion to dismiss Count Seven is **DENIED**.

Next, Defendant argues that Count Eight fails because Plaintiff improperly relies on O.C.G.A. §§ 51-1-6 and 51-1-8 to impose a legal duty on Defendant to prevent and correct sexual harassment at work. Dkt. Nos. 8-1 at 20–21, 1 ¶ 275. True, neither § 51-1-6 nor § 51-1-8 imposes a legal duty on Defendant because both statutes "merely set forth general principles of tort law."[16]

---

[16] Plaintiff also cannot rely on Title VII as the statutory basis for her negligence claim because "Title VII already creates a cause of action, and Plaintiff asserted claims under that remedial scheme, so she cannot maintain a duplicative remedy under state law." Comerinsky v. Augusta Coating & Mfg., LLC, 418 F. Supp. 3d 1252, 1265 (S.D. Ga. 2019) (citation and quotations omitted).

Reilly v. Alcan Aluminum Corp., 528 S.E.2d 238, 240 (Ga. 2000); see also Wells Fargo Bank, N.A. v. Jenkins, 744 S.E.2d 686, 688 (Ga. 2013) (citing O.C.G.A. § 51-1-6). Defendant's argument overlooks, however, that Plaintiff need not rely on a statute to show Defendant had a legal duty to act. "[A] cause of action will lie for breach of a duty arising under a statute *or common law*." St. Mary's Hosp. of Athens, Inc., v. Radiology Pro. Corp., 421 S.E.2d 731, 736 (Ga. Ct. App. 1992) (citations omitted) (emphasis added). Georgia law recognizes that "Failure to Maintain a Safe Work Environment Preventing Sexual Harassment is a negligence claim." Mathews v. Anderson, 826 F. Supp. 479, 481 (M.D. Ga. 1993) (citing Favors v. Alco Mfg. Co., 367 S.E.2d 328, 331 (Ga. Ct. App. 1988) (physical precedent only) (collecting cases)). Accordingly, while O.C.G.A. §§ 51-1-6 and 51-1-8 do not impose a statutory duty on Defendant, common law does, and Plaintiff's negligence claim may be sustained via common law negligence. Id.; Favors, 367 S.E.2d at 329, 331 (stating that Count Four of the complaint, which asserts, in part, "[the defendant] negligently failed to provide a work place which was free from sexual harassment" "sets forth a common law tort claim"). Thus, Defendant's motion to dismiss Count Eight is **DENIED**.

### iv.  Punitive Damages and Attorney's Fees

In her complaint, Plaintiff requests both punitive damages and attorneys' fees under federal and state law. Dkt. No. 1 at 38;

id. ¶¶ 298–304. These requests are included as Counts Eleven and Twelve in the complaint as well as in Plaintiff's prayer for relief. Id. at 38; id. ¶¶ 298–304. Defendant argues that Counts Eleven and Twelve should be dismissed because punitive damages and attorneys' fees are not stand-alone causes of action. Dkt. No. 8-1 at 22.

Defendant is correct that neither O.C.G.A. § 51-12-5.1 (punitive damages) nor O.C.G.A. § 13-6-11 (attorneys' fees) can function as an independent cause of action.[17] See Massey v. Kelly, Inc., 742 F. Supp. 1156, 1158 (N.D. Ga. 1990) ("Moreover, the Georgia statute for punitive damages is not grounds for an independent cause of action."); Harris v. Fulton-Dekalb Hosp. Auth., 255 F. Supp. 2d 1347, 1359 (N.D. Ga. 2002) (denying punitive damages because "[n]o independent cause of action sounding in tort as required by O.C.G.A § 51-12-5.1 remains in this case"); Lamb v. Salvage Disposal Co. of Ga., 535 S.E.2d 258, 261 (Ga. Ct. App. 2000) ("O.C.G.A. § 13-6-11 does not create an independent cause of action but merely permits in certain limited circumstances the recovery of the expenses of litigation incurred as an additional element of damages."). However, the fact that Plaintiff asserted

---

[17] Defendant does not argue that punitive damages and attorneys' fees are improper requests for relief under the applicable *federal* statutes. See Dkt. No. 8-1 at 22–23 (arguing only that punitive damages and attorneys' fees based on Plaintiff's state law claims are subject to dismissal).

her claim for attorneys' fees and punitive damages as their own count, separate from her other claims, is inapposite. <u>Tri-State Consumer Ins. Co. v. LexisNexis Risk Sol., Inc.</u>, 858 F. Supp. 2d 1359, 1371 (N.D. Ga. 2012). In addition to Plaintiff having requested these remedies in her prayer for relief, "what matters is that [Plaintiff] seeks litigation expenses related to a cause of action set forth in [her] other substantive counts." <u>Id.</u> Here, Plaintiff's substantive state-law claims remain pending and, thus, her requests for punitive damages and attorneys' fees are not subject to dismissal.[18] Defendant's motion to dismiss Counts Eleven and Twelve is **DENIED.**

### CONCLUSION

Defendant's motion to dismiss, dkt. no. 8, is **GRANTED in part and DENIED in part.** The motion is **GRANTED** 1) to the extent Plaintiff asserts Title VII claims for sex discrimination and retaliation based on time-barred "sex-based" comments in the workplace and Plaintiff's alleged assault by Stevens; 2) to the extent Plaintiff bases her IIED claim on the denial of a promotion and/or bonus; and 3) to the extent Plaintiff asserts an *independent* cause of action for ratification.

Defendant's motion to dismiss, dkt. no. 8, is **DENIED** in all

---

[18] Indeed, at the hearing, Defendant conceded that Plaintiff can assert requests for punitive damages and attorney's fees under any surviving claims. Dkt. No. 19.

other respects. Plaintiff's claims are sufficiently related to the allegations contained in her EEOC charge. Thus, Plaintiff's Title VII claims, Counts Four and Five, are not subject to dismissal. Furthermore, to the extent Plaintiff's ADA, GINA, and ADEA claims—Counts One, Two, and Three, respectively—rely on 1) Defendant's failure to promote her, 2) Defendant's refusal to issue Plaintiff's bonus, or 3) Plaintiff's use of FMLA leave, her claims are not time-barred. Further, Plaintiff's state-law negligence claims, Counts Seven and Eight, and IIED claim, Count Ten, are not barred by the GWCA, nor are they subject to dismissal for failure to state a claim at this stage. Finally, because Plaintiff's substantive claims remain pending, she may assert ratification as a theory of liability and maintain her requests for punitive damages and attorneys' fees.

    **SO ORDERED** this 14th day of May, 2025.


_____
HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA